# 11-2826-cr

## United States Court of Appeals
## for the Second Circuit

Docket No. 11-2826-cr

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

-against-

C.R.,

Defendant-Appellee.

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLEE C.R.**

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellee
**C.R.**

**COLLEEN P. CASSIDY,**
Of Counsel

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . 2

    The Offense . . . . . . . . . . . . . . . . . . . . . . . 2

    Appellee's Turbulent Family Life . . . . . . . . . . . . 3

    Plea Discussions and Appellee's Statements
    Under Polygraph . . . . . . . . . . . . . . . . . . . . 4

    Pre-Plea Psychological Evaluations . . . . . . . . . . . 5

    The Guilty Plea Before the Magistrate Judge . . . . . . . 5

    The BOP Psychological Evaluation . . . . . . . . . . . . 5

    The Presentence Report . . . . . . . . . . . . . . . . . 6

        The Probation Department's Recommended
        Guideline Range . . . . . . . . . . . . . . . . . 10

        The Probation Department's Psychological Risk
        Assessment . . . . . . . . . . . . . . . . . . . 11

    The Court Orders a Sentencing Hearing . . . . . . . . . 12

    The Psychological Evaluation by Dr. Prentky . . . . . . 12

    Further Reports by Government Experts . . . . . . . . . 14

    The Sentencing Hearing . . . . . . . . . . . . . . . . 15

        Testimony about the Adolescent Brain . . . . . . 15

        Testimony About CR's Potential For
        Rehabilitation and Risk of Re-Offending or
        Harming the Public . . . . . . . . . . . . . . . 17

i

Testimony About the Effects of Child
Pornography on Victims . . . . . . . . . . . . 24

Testimony About the BOP Treatment Program . . . . . 24

The Government's Claim that CR Sent Sexually
Suggestive Images to His Half Sister After His
Arrest . . . . . . . . . . . . . . . . . . . . . 25

Sentencing Submissions of the Parties . . . . . . . . 26

The District Court's Acceptance of the Guilty Plea . . . 27

Sentencing . . . . . . . . . . . . . . . . . . . . . . . 28

The Court's Sentencing Opinion . . . . . . . . . 28

The Sentence Imposed . . . . . . . . . . . . . . 29

ARGUMENT

POINT I

THE DISTRICT COURT'S CALCULATION OF THE
RECOMMENDED GUIDELINE RANGE WAS PROCEDURALLY
REASONABLE AND NOT CLEARLY ERRONEOUS . . . . . . . . . . . . 33

A.   The Court's Finding That CR Did Not Commit
     a Pattern of Abuse Is Not Clearly Erroneous. . . . 34

B.   The District Court's Finding That the
     Distribution Enhancement Did Not Apply is
     Not Clearly Erroneous. . . . . . . . . . . . . . 38

C.   The District Court's Decision Not to Apply
     the 2-level Enhancement For Use of a Computer
     Was Not an Abuse of Discretion. . . . . . . . . . 41

D.   If There Was Any Procedural Error in the
     Calculation of the Recommended Guideline
     Range, It Was Harmless. . . . . . . . . . . . . . 43

POINT II

THE DISTRICT COURT'S RULING THAT A MANDATORY
FIVE-YEAR SENTENCE FOR A CHILD PORNOGRAPHY
OFFENSE WOULD CONSTITUTE CRUEL AND UNUSUAL
PUNISHMENT SHOULD BE AFFIRMED IN THE UNIQUE

CIRCUMSTANCES OF THIS CASE . . . . . . . . . . . . . . . . 44

    A.    The Categorical Approach of *Graham* and *Roper* . . . 45

POINT III

THE GOVERNMENT'S CONTENTION THAT THE DISTRICT
COURT ERRED IN ALLOWING VOLUNTARY SURRENDER

FOR SENTENCE IS BOTH ERRONEOUS AND MOOT . . . . . . . . . . 57

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 58

## TABLE OF AUTHORITIES

<u>**CASES**</u>

<u>Estelle v. Gamble</u>, 429 U.S. 97 (1976) . . . . . . . . . . . 45

<u>Graham v. Florida</u>, 130 S.Ct. 2011 (2010) . . . . . . . . <u>passim</u>

<u>Graham v. Florida</u>, __ U.S. __, 130 S.Ct. 2011 (2010) . . <u>passim</u>

<u>H.J. Inc. v. Northwestern Bell Telephone Company</u>,
492 U.S. 229 (1989) . . . . . . . . . . . . . . . . . . . . 34

<u>Harmelin v. Michigan</u>, 501 U.S. 957 (1991) . . . . . . 44, 45, 54

<u>North Carolina v. Alford</u>, 400 U.S. 25 (1970) . . . . . . . . 28

<u>Roper v. Simmons</u>, 543 U.S. 551 (2005) . . . . . . . . . <u>passim</u>

<u>Thompson v. Oklahoma</u>, 487 U.S. 815 (1988) . . . . . . . . . 46

<u>United States v. Bermingham</u>, 855 F.3d 925 (2d Cir. 1988) . . 43

<u>United States v. Cavera</u>, 550 F.3d 180 (2d Cir. 2008) . . . . 43

<u>United States v. Dodd</u>, 598 F.3d 449 (8th Cir. 2010) . . . 39, 40

<u>United States v. Dorvee</u>, 616 F.3d 174 (2d Cir.
2010) . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 48

<u>United States v. Durham</u>, 618 F.3d 921 (8th Cir. 2010) . . . . 40

<u>United States v. Eppolito</u>, 543 F.3d 25 (2d Cir.
2008) . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

<u>United States v. Grober</u>, 624 F.3d 592 (3d Cir. 2010) . . . . 48

<u>United States v. Jass</u>, 569 F.3d 47 (2d Cir. 2009) . . . . . 43

<u>United States v. Johnson</u>, 221 F.3d 83 (2d Cir. 2000) . . 41, 42

<u>United States v. Larson</u>, 558 F.Supp. 2d 1103 (D.Mon.
June 5, 2008) . . . . . . . . . . . . . . . . . . . . . . . 51

<u>United States v. Larson</u>, 346 Fed. App'x. 166, 168 (9th
Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 51

<u>United States v. Layton</u>, 564 F.3d 335 (4th Cir. 2009) . . . . 39

iv

United States v. McGee, 553 F.3d 225 (2d Cir. 2009) . . . . . 40

United States v. Olfano, 503 F.3d 240 (3d Cir. 2007) . . . . 35

United States v. Pabon-Cruz, 391 F.3d 86 (2d Cir. 2004) . . . 41

United States v. Polito, 215 Fed.Appx. 354 (5th Cir.
    2007) . . . . . . . . . . . . . . . . . . . . . . 48, 50

United States v. Stern, 590 F.Supp.2d 945 (N.D. Ohio
    2008) . . . . . . . . . . . . . . . . . . 48, 50, 52, 53

United States v. Strayer, 2010 WL 2560466 (D. Neb.
    June 24, 2010) . . . . . . . . . . . . . . . . . . . . 51

United States v. Turner, 626 F.3d 566 (11th Cir. 2010) . . . 35

United States v. Tutty, 612 F.3d 128 (2d Cir. 2010) . . . 41, 42

United States v. Villafuerte, 502 F.3d 204 (2d Cir. 2007) . . 33

United States v. Wachowiak, 412 F.Supp.2d 958 (E.D. Wis.
    2006) . . . . . . . . . . . . . . . . . . . . 48, 51, 53

**STATUTES AND OTHER AUTHORITIES**

18 U.S.C. § 2252(a)(2) . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2252(b)(1) . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . 30

18 U.S.C. § 3553(a)(2)(D) . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 3742 . . . . . . . . . . . . . . . . . . . . . 56

18 U.S.C. § 4247 . . . . . . . . . . . . . . . . . . . . . 14

United States Sentencing Guidelines

    § 2G2.2, Application Note 1 . . . . . . . . . . . . . 39

    § 2G2.2(a)(2) . . . . . . . . . . . . . . . . . . . . 10

    § 2G1.2(b)(2) . . . . . . . . . . . . . . . . . . . . 10

    § 2G2.2(b)(3)(F) . . . . . . . . . . . . . . 10, 30, 33, 38

§ 2G2.2(b)(5) . . . . . . . . . . . . . . . . . . 11, 30, 33, 40

§ 2G2.2(b)(6) . . . . . . . . . . . . . . . . . . 10, 30, 33, 42

§ 2G2.2(b)(7) . . . . . . . . . . . . . . . . . . . . . 11

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

Docket No. 11-2826-cr

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

-against-

C.R.,

Defendant-Appellee.

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLEE C.R.**

**PRELIMINARY STATEMENT**

The government appeals from a judgment filed on June 21, 2011, in the United States District Court for the Eastern District of New York (Weinstein, J.), convicting the defendant-appellee of distribution of child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1) and sentencing him to 30 months' imprisonment and five years of supervised release. The government appeals the sentence.

## QUESTIONS PRESENTED

1.    Whether the District Court's Calculation of the Guideline Range Was Procedurally Reasonable and Not Clearly Erroneous.

2.    Whether the District Court's Ruling That a Mandatory Five-Year Sentence for a Child Pornography Offense Would Constitute Cruel and Unusual Punishment Should Be Affirmed in the Circumstances of this Case.

3.    Whether the Government's Contention That the District Court Erred in Allowing Voluntary Surrender for Sentence Is Both Erroneous and Moot.

## STATEMENT OF FACTS

### The Offense

Defendant-Appellee "CR," an immature 19 year old college student, was charged with one count of possessing child pornography and four counts of distributing child pornography, based on his participation in a peer-to-peer file sharing program on "Gigatribe" that allowed invited friends to access his files, which included pornography.  GA 164.[1]  An undercover FBI agent had accessed and transferred a child pornography file from CR's computer through the Gigatribe peer-to-peer file sharing program.  GA 164.  The FBI then executed a search warrant at his mother's apartment, seized two computers, and found pornographic videos and pictures, which CR

---

[1]  "GA" refers to pages of the government's appendix.  "SA" refers to appellee's sealed supplemental appendix, submitted with this brief.

admitted were his.  GA 165.

## Appellee's Turbulent Family Life

CR's biological mother abandoned him in infancy and he was raised in the sexually overcharged household of his father.  GA 163-64.  When CR was less than one year old, his mother left his father and became an exotic dancer and cocaine addict.  During his childhood, CR had little contact with his mother, who visited him only a handful of times.  After his parents divorced, his father's 22 year-old girlfriend moved in; they married three years later and a daughter was born, CR's half-sister.  GA 162.  CR developed a close relationship with his young stepmother, whom he described as "the most important and nurturing person in his life."  GA 162.  When he was 15 years old, he found his stepmother in bed with another man, in an affair that led to a bitter divorce.  GA 162.

At about this time, when he was 15 years old, CR began smoking marijuana and drinking alcohol.  GA 163.  A year later, when he was 16, a friend introduced him to child pornography on the internet and he began watching it with male and female peers.  GA 163.  Since the age of 13, CR had been viewing adult pornography for hours each week.  GA 163.

When he was 18, CR reconciled briefly with his biological mother and lived with her for a short time when he began attending community college in Queens.  GA 164.  She had married a man 13 years younger whom she met in drug rehabilitation.  They had a six

3

year old daughter and the household dynamics were turbulent. CR had a difficult relationship with his biological mother and never developed a close relationship with his stepfather. GA 164. CR smoked a lot of marijuana and returned home late to avoid confrontations. GA 164. He viewed child pornography on the computer when he came home. GA 164. He was arrested at his mother's apartment.

**Plea Discussions and Appellee's Statements Under Polygraph**

Because of CR's youth and the difficult family environment in which he was raised, the government considered dropping the distribution charges, which carry a mandatory minimum prison sentence of five years, and charging him with only the possession count. During plea discussions, CR's original lawyer agreed to have him polygraphed. In the course of the polygraph exam, CR admitted engaging in three instances of incestuous conduct with his younger half-sister in the past, when he was 15 and 16 years old, and once after he began college, when he was probably 18.[2] GA 163. The first of these episodes occurred on a family vacation when CR's father placed him and his half-sister in the same bed in a hotel. GA 163. Based on these admissions, the government refused to drop the distribution counts and insisted on the mandatory minimum

---

[2] The PSR reports that he was 18, and that age is stated in Judge Weinstein's opinion, but Dr. Prentky, one of the psychologists who evaluated CR, testified that it was unclear whether CR was 17 or 18 at the time of the third episode.

4

sentence of five years in prison.  GA 165.

## Pre-Plea Psychological Evaluations

CR was evaluated by both Dr. N.G. Berrill of the New York Center for Neuropsychology and Forensic Behavioral Science, at the behest of Pretrial Services, and by a private psychologist, Dr. Gabrielle Stutman.  GA 213-14.  Both evaluations concluded that CR was grossly naive and immature for his age, and that he was neither antisocial nor predatory.  GA 214.  He was also depressed and upset by his rejection by both his mother and stepmother.  GA 215. Significantly, Dr. Stutman concluded that CR's distorted thinking about the acceptability of viewing pornography with minors was caused by his premature access and frequent exposure to pornography, his maternal abandonment, and the discovery of his stepmother's sexual betrayal, all of which had combined to delay his psychological and emotional development.  GA 216.

## The Guilty Plea Before the Magistrate Judge

CR pled guilty before a magistrate judge on September 16, 2009 to one count of distributing child pornography.  He admitted participating in peer-to-peer file sharing with invited friends. GA 165.

## The BOP Psychological Evaluation

During his release pending sentence, CR violated bail conditions by testing positively for marijuana and missing two substance abuse treatment sessions.  GA 123.  An evaluation by the

5

Bureau of Prisons was ordered and he spent one month under evaluation and observation at the Federal Medical Center Devens, beginning on January 4, 2010.  GA 216.  The Bureau of Prisons psychologist basically agreed that CR was immature for his age and concluded that he presented "excessive dependency, immaturity, and poor coping ability."  SA 10.  The report declined to diagnose CR with a personality disorder because "his young age makes it difficult to determine whether these are stable personality features or are limited to his stage of development."  SA 10.  The BOP report also acknowledged the possibility that CR's "symptoms of depression and anxiety . . . could worsen with the continued stressors of confinement, so his symptoms should be monitored."  SA 10-11.  The Court ordered that CR remain on bond with increased monitoring.

**The Presentence Report**

The Probation Department prepared its presentence report ("PSR") on January 8, 2010, while CR was under evaluation at Devens.[3]  The PSR described the offense conduct as trading child pornography images and videos in peer to peer file-sharing programs on Gigatribe and Limewire.  PSR 3-4.  These were private file-sharing programs that allowed the user to share files with an invited group of friends.  PSR 3.  After an undercover agent

---

[3]  The Presentence Report is submitted to the Court separately under seal.

discovered CR's Gigatribe file online, the FBI obtained a search
warrant and searched and seized CR's computers on January 15, 2009.
PSR 4.    CR readily admitted that he had downloaded child
pornography videos, told the agents that he had downloaded files
from Limewire as well as Gigatribe, and showed them how he did it.
PSR 4.  CR stated that he was interested primarily in pornography
involving girls and boys 13 years and older, some of boys under 13,
and that any pictures of young children were present only because
they were grouped with older boy materials.  PSR 5.  He admitted to
once meeting an older man on Craigslist for sexual contact.  PSR 9.
CR described himself as sexually confused.   PSR 5.   CR admitted
that he shared his child pornography folders with 10 to 20
Gigatribe users on his invited buddy list.  PSR 5.

     The PSR described CR's troubled childhood, caused by his
parent's separation when he was an infant, his mother's cocaine
addiction, and the chaos of his parents' lives.  PSR 12.  CR's
father described an incident in which CR had a weekend visit with
his mother when he was 2 years old and CR's father picked him up to
find his mother high on cocaine, with drugs accessible in the room.
PSR 12.  When the father refused to allow further visits, the
mother broke into the father's apartment and absconded with the
toddler CR.  PSR 12.  The police had to get involved and the mother
had no regular contact with CR for years.  PSR 12.  CR lived with
his father, a retired police officer who then worked in the family

7

business, nursing home management.    PSR 12.

The father reported that CR's paternal grandfather, a man of substance who was for many years director of the Hebrew Home for the Aged in Riverdale, was very involved in CR's life and a positive influence, but he died in 1999 when CR was 10 years old. PSR 12-13.    After his death, his wife, CR's grandmother, assisted the family financially but was emotionally distant.    PSR 13.    At the time of the PSR, CR's father reported that he had lost his most recent job after his son's arrest was reported in the local newspaper.    PSR 13.

CR lived with his father on the upper East Side in New York until he was 13.    PSR 14.    When CR was 2 or 3 years old, his father's new 22-year-old girlfriend, Arabella Van De Wiele, moved in and they later married.    PSR 14.    She was a homemaker and developed a close maternal relationship with CR.    PSR 14.    She and the father had one child, CR's half-sister.    PSR 14.    When CR was 13, the family moved to a house in Scarsdale.    PSR 14.    Two years later, CR discovered his step-mother in bed with a family friend, an event that his father described as deeply traumatic for CR. PSR 14.    The family moved back to the city but the couple eventually separated and CR and his father moved into a new apartment.    PSR 14.

When CR graduated from high school two years later, he left for Johnson and Wales College and his father moved to a small

8

studio apartment in Valhalla. PSR 15. CR left college after one unsuccessful semester, but his father's apartment was too small for him to live at home. PSR 15. His biological mother, now married with a daughter and living in Rockaway Beach, Queens, offered to take him in. PSR 15. CR moved in with her family, sleeping on the living room couch, to attend local community college. PSR 15. After his arrest, he was "kicked out" of his mother's apartment and was living with his father and his father's current female friend, in a rental apartment in Scarsdale. PSR 15. On a home visit to the Scarsdale apartment, the probation officer met a 24 year-old woman named Winsara, whom the father described as his "platonic friend" who was paid to stay home and monitor CR for his bail conditions. PSR 15. However, CR told the officer that Winsara slept with his father every night. PSR 15.

The PSR summarized the reports of Drs. Stutman and Berrill, PSR 19-28. It also summarized the report of Dr. Edward A. Leonhard, CR's current treating psychologist, who described CR as an unusually insightful and reflective young man who was highly motivated and worked very hard to establish a trusting relationship. PSR 31. Dr. Leonhard reported that CR had made remarkable progress in his therapy, had come to see the inappropriateness of his sexual impulses and had gained a sense of responsibility and accountability. PSR 31. Dr. Leonard reported: "Indeed he is one of those rare clients who have the innate ability

9

to work effectively on these sexual issues." PSR 31.

The PSR described the polygraph exam and the admissions that CR made about sexual contact with his half-sister. PSR 5-6. The first instance occurred on a family trip, in which his father placed him in the same bed with his half sister while the father slept in a different bed in the same room. PSR 5. CR was 15 and his half sister was 8, and the contact involved his sister stimulating his penis after he spontaneously got an erection. PSR 5. The second incident was a year later, when CR was 16 and the sister was 9, and the contact was the same, with him also touching over her panties. PSR 5-6. The third episode occurred two years later, when CR was 18 and the sister was 11, at CR's father's house in Scarsdale. PSR 6. This involved mutual oral sex. PSR 6.

CR also acknowledged that he had dated two girls who were 16 and 15 when he was 18 and 19 and had engaged in some sexual contact with them, and that he had sexual contact with a 15 year old boy when he was 19. PSR 6.

### The Probation Department's Recommended Guideline Range

Beginning with the base offense level of 22, U.S.S.G. § 2G2.2(a)(2), the PSR added 2 levels under Guideline § 2G2.2(b)(2) because some of the files seized included images of minors under 12, 2 levels more for distribution under Guideline § 2G2.2(b)(3)(F), and 2 levels pursuant to Guideline § 2G2.2(b)(6) because a computer was used in the offense. PSR 10. In addition,

10

the PSR recommended two 5-level enhancements: one for the number of images being greater than 600, pursuant to Guideline § 2G2.2(b)(7) and the other on the theory that CR engaged in a "pattern of sexual abuse" of his half-sister, under Guideline § 2G2.2(b)(5). PSR 10. With a 3-level deduction for acceptance of responsibility, the resulting total offense level was 35, which, with a Criminal History Category of I, yielded a guideline range of 168-210 months. PSR 11, 37. The PSR noted that CR had allowed the FBI to take over his file-sharing identity to conduct an undercover investigation, and that this could be considered a mitigating circumstance. PSR 39.

### The Probation Department's Psychological Risk Assessment

On March 9, 2010, the Probation Department ordered an evaluation by Richard Hamill, a forensic psychologist, on the question whether CR posed a risk of committing another sex offense. SA 13. Dr. Hamill reviewed the prior evaluations, administered several tests, and interviewed CR. SA 14. The testing results suggested that CR had poor impulse control, that he acted out directly on feelings to obtain immediate gratification, and that he frequently lacked forethought about consequences and alternative courses of action. SA 20, 25. His scores on a psychological screening test fell within normal limits and his score on the Abel Assessment for Sexual Interest "suggests that he did not identify himself as holding beliefs supportive of child molestation." SA

11

23.

Despite these results, Dr. Hamill concluded that CR posed a moderate to high degree of risk for committing another sex offense. SA 23. This conclusion was based largely on application of the factors in th "Static-99" rubric, a method of scoring individuals charged with or convicted of child molestation, not child pornography. SA 23. Based on three factors in Static 99, namely, the age of the offender, history of substances abuse, and his intimacy skills for forming and maintaining healthy intimate relationships, Dr. Hamill claimed that he posed a moderate to high risk. SA 23, GA 217.

**The Court Orders a Sentencing Hearing**

On June 10, 2010, after reviewing the plea allocution, the presentence report, and the various psychological reports finding that CR was grossly immature for his age, Judge Weinstein ordered a hearing with expert witnesses to address the harm to children from child pornography and from the defendant's conduct in particular; the risk that the defendant will harm others if he is or is not incarcerated; the risk that the defendant will be raped or otherwise abused in prison; the nature and suitability of treatment in prison; and the defendant's neurological and psychiatric condition, including developmental maturity, now and at the time the offenses were committed. GA 115-116.

12

**The Psychological Evaluation by Dr. Prentky**

In advance of the hearing, CR's counsel requested an evaluation by Robert Prentky, Ph.D., a forensic psychologist who specializes in sexual criminal behavior and the treatment of sex offenders. GA 236. Dr. Prentky reviewed CR's psychological records, interviewed CR, and interviewed his father and paternal grandmother. Prentky's report characterized the dominant theme in defendant's life as "loss, sadness, and depression." SA 36.

Dr. Prentky's report attributed much of CR's angst, emotional complications, and abnormal sexual incidents to early childhood neglect and mistreatment by his biological mother. SA 36 (describing defendant's biological mother as "an irresponsible absentee figure, neglectful, and drug-addicted, who, it appears, exposed him to sexuality at a young age."). Dr. Prentky learned from family interviews that CR's biological mother was using cocaine while pregnant with him and that at the age of seven or eight, CR learned both of his mother's employment as a stripper and her proclivity for multiple sexual partners. SA 28. On the rare occasions when his mother did spend time with him, "she introduced [him] to small mischief things, like sneaking into movie theaters." SA 28.

Dr. Prentky's report traced the defendant's academic trajectory and attributed the defendant's sudden and dramatic drop in grades at the beginning of his adolescence to the major events

13

taking place in his life at that critical time. SA 29, 36. Specifically, after CR moved from Manhattan to Scarsdale at age 13, he (1) never saw his biological mother, who had begun to recover from her drug addiction, (2) discovered his step-mother had been cheating on his father and begun to drink; and (3) had no social life and no friends for three years. SA 36. The report summarizes, "By his mid to late adolescence CR was a youngster with poor self-esteem, deficits in his social skills, and marked psychosocial immaturity." SA 36.

Notably, relying upon data collected through the Abel Assessment of Sexual Interest, the examination administered by Dr. Hamill, see Hamill Report, Dr. Prentky emphasized that CR appeared to lack a clear sexual preference with respect to both gender and age. SA 34. Moreover, because "there is no basis for concluding that CR has *serious difficulty* in refraining from sexually violent conduct or child molestation," the report concluded that the defendant "does not meet the legal standard to be considered a sexually dangerous person under 18 U.S.C. § 4247." Id. at 9 (emphasis in original). GA 219, SA 37.

**Further Reports by Government Experts**

The government referred Appellee for evaluation of his cognitive functioning by Dr. William Barr, a neuropsychologist. Dr. Barr observed that CR was "somewhat younger than expected, given his chronological age," and that he exhibited some

14

impulsivity and carelessness throughout the day of testing. GA 217. His test results showed no cognitive impairment and intellectual functioning in the "high-average" range. GA 217. Significantly, Dr. Barr concluded that CR did not display any cognitive impairments in response inhibition, working memory, and cognitive flexibility, areas in which pedophiles as a group exhibit impairments. GA 218. Neither did he exhibit any evidence of anti-social or borderline personality disorder. GA 218.

The government also requested Risk Assessment and Evaluation from Dr. Susan Sachsenmeier. She administered the Static-99 test, which application is expressly limited to those who have been charged with or convicted of contact offenses, and concluded that CR posed a moderate-high to high risk of reoffending. GA 220. Because of Dr. Sachsenmeier's inappropriate use of the Static-99 test and numerous other errors in her methodology and understanding of the basic facts in the case, which are discussed below in the hearing testimony, her conclusions were not credited by the district court. GA 220.

**The Sentencing Hearing**

A sentencing hearing was held, beginning on October 7, 2010, and continuing on January 25-28, 2011. Several expert witnesses testified, including psychologists who had prepared reports.

### Testimony about the Adolescent Brain

Dr. Laurence Steinberg, a Professor of Psychology at Temple

15

University with a Ph.D. in Developmental Psychology from Cornell, testified as an expert in adolescent brain development and psychosocial development. He had served as the lead scientist for the American Psychological Association, advising counsel in the preparation of amicus briefs in the Supreme Court cases of Roper and Graham. GA 297.

Dr. Steinberg testified that a person's brain is fully developed at some point in the mid-20's and that at ages 17, 18, and 19, the brain is still developing. GA 297-98. Developmental age varies from chronological age and there is no significant change in the development of the adolescent brain from one year to the next just because a person turns 18. GA 297-98. Dr. Steinberg specifically disagreed with the testimony of the government expert, Dr. Barr, that adolescence ends at 18. GA 298.

The brain of an average 19 year old is not fully developed. GA 298. In particular, those regions of the brain that are important for functions like impulse control and weighing risks and rewards are still developing then and even after age 19. GA 298-99. Mylenation and connectivity between brain regions is still developing during these years, until the mid-twenties. GA 299-300. Connectivity plays an important role in processing emotion and self-regulation. GA 300. At age 18, impulse control, susceptibility to influence, thinking ahead, and considering the future consequences of one's actions are all still immature. GA

16

300-01. Self-regulation and self-control improve between ages 19 and 25. GA 300-01.

Protective factors against future offending included parents who provided structure and guidance, gainful employment, and completion of evidence-based treatment. GA 301. Young people who are in school or gainfully employed, who are in treatment for any mental problems, and who have a good home environment are less likely to reoffend than those who are not in school or working and who associate with deviant peers. GA 301. This research also demonstrated that it was more productive for positive development to keep juveniles and young adults out of prison, which disrupts education and social development, and instead keep them in the community. GA 301.

### Testimony About CR's Potential For Rehabilitation and Risk of Re-Offending or Harming the Public

Dr. Meg Kaplan, Director of the Sexual Behavior Clinic at the New York State Psychiatric Institute, and Associate Clinical Professor of Psychology at Columbia University's College of Physicians and Surgeons, testified about the characteristics of late adolescent sex offenders and how they differ from adults. GA 222. She testified that the sexual patterns of adolescents were generally less set than adults and so adolescents were easier to treat and redirect. GA 222.

After reviewing eight reports of previous psychological evaluations of CR, and interviewing him herself, Dr. Kaplan

17

testified about her clinical impressions and treatment recommendations. Dr. Kaplan concluded that CR was highly treatable based on several factors. One was that CR had been living in the community for two years since his arrest and had not committed any sexual offenses. Another positive factor was his successful substance abuse treatment. A third was the fact that, since the offense, he had had consensual sexual relations with peers his own age. GA 223-24. Dr. Kaplan testified that it was normal for people of CR's age to be interested in, even preoccupied with sex, and that sexual interest in peers made it easy for treatment to tip the scales away from interest in younger people. GA 224. A fourth factor was CR's motivation to succeed at treatment. GA 225.

Dr. Kaplan testified that CR's sexual contact with his half-sister added to the risk of re-offending, but that an incest offense created a lower risk than a nonfamilial contact offense. This is because, especially in the case of younger offenders, an incest offense is more related to access and curiosity than picking a target based on a sexual interest pattern. GA 225. Dr. Kaplan also found that the infrequency of the incest episodes, which were spaced out by years, and the fact that the first one occurred when they were placed in the same bed by their father, clearly made it an access rather than predatory offense, and presented a lower risk of reoffense with treatment. GA 225-26. In addition, CR was forthcoming in his interview about the episodes with his sister.

18

He explained that he was alone with her on many occasions and never thought about molesting her, he did not know why he did so on the three occasions, and that, although he had fantasized about young boys, he had never fantasized about his sister. GA 231.

Dr. Kaplan testified that the most effective treatment was masturbation therapy, which was not available in prison. GA 226-28. She also testified that CR would be at risk of sexual predation by older men in a prison setting. GA 232. Dr. Kaplan recommended community treatment rather than incarceration. GA 232.

Dr. Richard Prentky also testified, in accordance with his report, that CR presented a very low risk of reoffending. GA 236. In addition to the factors cited in his report, by the time of the hearing, the fact that CR had been at liberty for two years and had not reoffended with respect to child pornography or sex offenses was "extraordinary, important, and [a] weighty piece of evidence for" Dr. Prentky. GA 236-37. The fact that Appellee had violated some terms of his release, for example smoking marijuana and using Facebook, made it all the more significant to Dr. Prentky that he had avoided any sexual reoffending. GA 236-37. Dr. Prentky referred to studies demonstrating that sex offenders who reoffend tend to do so within the first 24 months.

Another factor that Dr. Prentky relied on for his risk assessment, like Dr. Kaplan, was the fact that appellee's contact offense conduct was with his half-sister, because studies showed

19

that the lowest risk of reoffense was among molesters of a family member of the opposite gender. GA 238. Dr. Prentky used two assessment tools for Appellee: the Juvenile Sexual Offender Assessment Protocol and the Estimate of Risk of Adolescent Sexual Offense Recidivism. Dr. Prentky concluded that the juvenile protocol was appropriate for CR because his child pornography offenses began when he was 15 and ended at age 19 and his improper contact with his sister began when he was 15 and ended "somewhere around the age of perhaps 18, perhaps he was 17." Dr. Prentky and his colleagues frequently use the juvenile assessment on offenders who are 19 or 20 and committed their offenses when they were younger. GA 238.

Dr. Prentky testified that outpatient treatment in a non-custodial setting was far preferable to treatment in prison for an offender like CR who did not a present a high risk of reoffending. GA 240. Dr. Prentky referred to studies that showed fairly minimal results from sex offender treatment in prison and somewhat better results for treatment outside of prison. Dr. Prentky noted that, contrary to popular belief, sexual offense recidivism rates were quite low to begin with, about 13 percent without treatment. Effective treatment could drive the rates down to 8 or 9 percent. GA 244.

In addition to Dr. Barr, who testified consistently with his report that Appellee had no neuropsychological impairment that

20

would interfere with successful treatment either in the community or in prison, the government called Dr. Sachsenmeier as its expert on risk assessment and recidivism for sex offenders. GA 219-220. Dr. Sachsenmeier administered various psychological tests and screening tools and pronounced CR to be in "the moderate-high to high risk range for reoffense for both online and offline offending." GA 220. She also described his "issues" as including "family dysfunction, pedophilia, hebephilia, child pornography addiction, incest, drug dependence and abuse, and personality disorder." GA 221. Dr. Sachsenmeier's findings were so riddled with errors, both with respect to CR's basic history and her methodology, that the district court discredited her conclusions.

First, Dr. Sachsenmeier used the Static-99 test to evaluate CR even though the coding manual for that test limits the test to those who have been charged with or convicted of a hands-on sexual offense and explicitly excludes a self-reported hands on offense, rather requiring an official criminal history. GA 249-50. Dr. Prentky explained that this was because the test is meant to determine the risk of reoffending by a person who had already been detected or sanctioned for a hands-on sexual offense and has continued to re-offend. GA 251.

Second, in her application of the Static-99, Dr. Sachsenmeier elevated CR's risk scores by first placing him in the high-risk high-need group because of the multiple referrals for forensic

21

evaluations (even though they were all for the same offense and requested as part of this litigation). She added a point because of his youth and another point because he had not lived with a lover for at least two years (even though he was arrested when he was only 19, before the age when people generally have such relationships). GA 255. She also added one point for "unrelated victims" and one point for male victims based on the fact that the child pornography victims were unknown to CR and many of them were male, even though these categories are meant for contact offenses (where higher risk is predicted for contact with a non-familial person of the same gender). GA 255-59. Finally, she scored CR's self-reported sexual contact with a 15 year old boy as a sexual offense.

Dr. Prentky testified that the coding manual for Static-99 clearly excludes child pornography from the victim variable points because all of the literature underlying these risk items is based on contact offenses and that they did not apply to pornography offenses. GA 259. Dr. Prentky also disagreed with Sachsenmeier's view that consensual contact between a 19 year old and a 15 year old should be coded as deviant, because they are essentially peers. GA 260. Both Dr. Kaplan and Dr. Prentky disagreed with Dr. Sachsenmeier's diagnosis of CR as having "hebephilia," sexual interest in adolescents. They both testified that "hebephilia" was not an accepted psychiatric diagnosis in the DSM, that it was

22

highly controversial, and that a sexual interest in teenagers or adolescents was not pathological but was within normal range. GA 231. Particularly in adolescence, normative sexual behavior includes 15 year olds. GA 260.

Third, Dr. Sachsenmeier's diagnosis and scoring was influenced by fundamental errors and incorrect assumptions about CR's sexual history. For example, she believed, entirely erroneously, that CR frequented "glory holes," which involved anonymous sex with strangers. GA 234-35. This was simply untrue, but apparently Dr. Sachsenmeier misread reports that CR had denied ever visiting glory holes to say that he had frequented them. GA 235. She also incorrectly asserted that CR had unprotected sex with "numerous people who are drug addicts and unknown sexual perverts without even using a condom and going from person to person." The court noted the complete lack of evidence supporting this statement; rather, CR had reported having seven sexual partners, which Dr. Prentky testified was unremarkable given current mores. GA 236. There was no evidence anywhere of sex with drug addicts or perverts. These fundamental errors of fact supported Dr. Sachsenmeier's opinion that CR not only committed incest with his half-sister but was "a broadly deviant person."

The district court found Dr. Prentky's testimony credible and supported by the literature. It rejected Dr. Sachsenmeier's risk assessment and report as "untenable." GA 234, 261.

23

**Testimony About the Effects of Child Pornography on Victims**

Judge Weinstein heard extensive testimony about the harmful effect of child pornography on its victims, that is, the subjects of the photographs or videos. GA187-212. Testimony was taken from a psychologist who works with such victims and from the parents and treating psychologist of a young woman who was the subject of child pornography videos taken by her father years before, and who suffered psychological distress from the knowledge that the videos were still circulating. GA 187-212.

**Testimony About the BOP Treatment Program**

Dr. Cheryl Renaud, a psychologist who coordinates the sex offender treatment program at the Federal Medical Center, Devens, testified about that program. She testified that the program at Devens is the BOP's only high-intensity residential sex offender treatment program. GA 269. This program, unlike the less intense programs elsewhere in the BOP, houses all participants in the program together in the treatment unit in an environment that is highly structured to promoted self-management. GA 272. The other programs involve treatment sessions but inmates live in the general prison population.

Completion of the Devens program normally takes about 18 months, but inmates are admitted when they have 27 to 30 months remaining on their sentences. GA 270, 273. Dr. Renaud testified that an inmate with only a two year sentence would not be able to

24

participate in the program.   GA 273.

**The Government's Claim that CR Sent Sexually Suggestive Images to His Half Sister After His Arrest**

In its effort to portray CR as a sexual predator, despite all of the credible expert testimony to the contrary, the government claimed that CR "kept sending sexually suggestive pictures to his sister." It's only basis for this claim was the following vague statement elicited from Agent Thompson:

> Q:  Have you spoken to the defendant's half sister's mother about the defendant's sexual abuse of his half sister?
>
> A:  Yes.
>
> Q:  Is the defendant's half sister currently undergoing mental treatment?
>
> A:  Yes.
>
> Q:  During this treatment was it discovered the defendant has kept sending sexually suggestive pictures to his half sister?
>
> A:  Yes.

G.Br. 8-9, 48, 57; GA 25, SA 42.  On cross-examination, Thompson revealed that this vague information came from a progress note made by a medical student when the half-sister was in a psychiatric hospital.  SA 45-47.  There was no copy or description of any picture, and no time frame or date during which the pictures were purportedly sent.  SA 45-47.  It was not known whether the medical student saw a picture or only heard about it.  Thompson did not interview the half-sister or investigate further.  SA 46-47.

25

The district court did not credit this claim and did not even refer to it in its lengthy opinion.

On March 10, Judge Weinstein issued a draft opinion, concluding that a five-year mandatory sentence was unconstitutional as applied to CR and stating its preliminary intention to impose a sentence of 30 months, so that CR could receive the benefits of the BOP's intensive treatment program at the Devens facility. This opinion, which served as the basis for the Court's ultimate opinion, is discussed at pp. 28-32, *post*.

## Sentencing Submissions of the Parties

On May 6, the government and defense counsel submitted sentencing letters. GA 120-145.

The government argued that the mandatory minimum sentence was not unconstitutional and that the Probation Department's recommended guideline range of 168-210 months was correct. GA 128-140. Nevertheless, the government did not ask the court to impose a guideline sentence but rather requested that the court impose a sentence of at least 60 months, the statutory minimum. GA 120, 140.

Defense counsel objected to all of the guidelines enhancements recommended in the PSR and contended that the guideline range was 30-37 months. GA 142-144. Defense counsel noted that the court's draft opinion concluding that a 30-month sentence would not be cruel and unusual punishment nor greater than necessary to comply with the purposes of sentencing was predicated on CR actually being

designated to FMC Devens for intensive residential treatment. GA 144. Counsel requested that the court retain jurisdiction pending designation, and if CR was not designated to Devens, to impose an alternative sentence of time served plus seven years of supervised release with outpatient sex offender treatment. GA 145. In the event that the court concluded that it was required to apply the mandatory minimum, the defense, like the government, requested a 60 month sentence. GA 144.

**The District Court's Acceptance of the Guilty Plea**

On May 10, 2011, CR appeared before Judge Weinstein for acceptance of his plea and sentencing. Judge Weinstein expressed concern about the voluntariness of the guilty plea and whether CR had intentionally distributed child pornography by passively permitting others to access his files. GA 50-60. Judge Weinstein personally questioned Appellee about his intent to distribute pornography and elicited that CR did not intend to distribute, but only intended to receive. He told the court that the program required him to share his material in a folder but that downloading of his files was done by others when he was not at home. GA 166.

Judge Weinstein was reluctant to accept the plea and suggested that CR go to trial on the distribution question. GA 62-64. Defense counsel explained that it was not in CR's interest to reject the plea because the government had threatened to supercede with an "advertising" count that carried a 15-year mandatory

27

minimum sentence. GA 66-67. Although the defense would have
challenges and defenses to an advertising count, the defendant was
not willing to take the risk that he could face a 15 year mandatory
minimum. On May 16, after giving CR more time to consider whether
he wished to plead, CR pled guilty and the court accepted the plea.
GA 73-76. The court stated in its opinion that, although it had
doubts about whether CR admitted "distribution," it accepted the
plea pursuant to North Carolina v. Alford, 400 U.S. 25, 37-38
(1970). GA 168.

**Sentencing**

### The Court's Sentencing Opinion

Judge Weinstein filed an opinion on June 21, 2011, in which he
concluded that a mandatory five year prison term for CR would be
cruel and unusual punishment. GA 302-306. Judge Weinstein found,
based upon the hearing testimony, that at the time of the offense
CR was "a developmentally immature young adult with limited ability
to appreciate legal limits on contacts with child pornography and
to control his viewing of easily accessible internet programs." GA
301. Relying on expert testimony and studies demonstrating that
there is no magic age at which adolescents become adults and that
development extends past the 18th year, the court concluded that CR
was a essentially a juvenile and should be considered as such for
purposes of the Eighth Amendment. GA 293-302. Significant to the
court's conclusion was the fact that CR was a very immature 15 year

28

old when he began viewing child pornography. The court found that CR "viewed and downloaded child pornography between the ages of fifteen and nineteen, well within the bounds of the adolescent studies" and "during a state of adolescent development that neuropsychological research has found to have significant implications for insight, decision making, judgment, risk taking behavior, and ultimately culpability." GA 302. Moreover, the court found that "lack of parental control and a turbulent, sexually overstimulating menage denied CR external controls not yet available to him internally." GA 302.

The district court applied the categorical approach to the Eighth Amendment that the Supreme Court applied to juveniles in Graham v. Florida, __ U.S. __, 130 S.Ct. 2011 (2010) and Roper v. Simmons, 543 U.S. 551 (2005). GA 288-293, GA 301-305. After considering the nature of CR's pornography offense -- even if technically a "distributor" he "played an exceedingly limited role in the overall child pornography market", GA 302, and surveying the widespread judicial concern over excessive sentences and mandatory minimums for adolescents convicted of child pornography offenses, GA 289-292, the court concluded that a five-year minimum sentence as applied to CR "serves no legitimate penological goal." GA 305. Thus, the court held that the mandatory minimum sentence was unconstitutional as applied and refused to impose it.

29

**The Sentence Imposed**

At the sentencing proceeding and in its opinion the court considered the sentencing factors of 18 U.S.C. § 3553(a), including the recommended guideline range. GA 79-15, GA 305-310. The court began with the base offense level of 22 and accepted two of the enhancements proposed by the Probation Department and the government: the 5-level enhancement for possession of more than 600 images and the 2-level enhancement for possessing images of minors under the age of 12. GA 82, GA 91, GA 306.

The court rejected the 5-level enhancement in U.S.S.G. § 2G2.2(b)(5) for a pattern of sexual abuse on factual grounds: "Because the defendant's inappropriate conduct with his half-sister was on three occasions over a period of five years the court does not find a 'pattern of sexual abuse.'" GA 306. The court noted that two of these episodes occurred when CR was well under the age of eighteen and under the supervision of his father. GA 306. The court found that these "aberrant acts separated by long periods, in large measure due to the failure of proper parental supervision." GA 87. The court declined to impose the 2-level enhancement in U.S.S.G. § 2G2.2(b)(6) for use of a computer on the ground that virtually every child pornography offense involves use of a computer. GA 306. GA 89. The 2-level enhancement for distribution under U.S.S.G. § 2G2.2(b)(3)(F) was rejected on the ground that CR did not actively distribute any child pornography,

nor intend to distribute, but participated in a passive peer-to-peer file sharing program with people invited to share his files. GA 84-85, GA 166-67, GA 305. After a 3-level deduction for acceptance of responsibility, the court's total offense level of 26, with a Criminal History Category of I, yielded a guideline range of 68-73 months. GA 91, GA 306.

Judge Weinstein applied the other sentencing factors of s 3553(a) and concluded that a sentence of 30 months was sufficient but not greater than necessary to achieve the goals of sentencing in this case. GA 104, GA 307-12. The court considered the nature and circumstances of the offense, particularly the fact that CR did not actively distribute pornography but only participated in peer to peer filing sharing, that there was little or no active conduct, that he was essentially a passive viewer, and that the images he had were relatively mild in the child pornography world, the majority being images of 10-12 year old boys and no images of violence or sadism. GA 307. As for the history and characteristics of defendant, the court considered the mitigating circumstances of CR's youth when he began viewing child pornography, the psychological evidence that he was "grossly immature and naive" for his age, the scientific research on maturation in adolescents, and the unhealthy sexual atmosphere created by his parents. GA 309. The court considered CR's need for sex offender treatment under § 3553(a)(2)(D), which he would be

31

able to receive with a 30 month sentence. The court concluded that 30 months was sufficient to reflect the seriousness of the offense, to provide just punishment, to afford adequate deterrence, and to protect the public. GA 309-310. The court considered the episodes of incest between CR and his half-sister and concluded that any continuing relationship with his sister would be limited and not likely to lead to further objectionable conduct. GA 312.

Judge Weinstein considered CR's need for treatment to be extremely important. The court stated that its opinion was the best course for CR's rehabilitation would have been a probationary sentence with intensive outpatient treatment, the course that the reliable expert testimony strongly supported. GA 312. However, Judge Weinstein decided on a sentence of 30 months in deference to the "strong public policy support for some incarceration to deter future conduct." GA 312. The fact that a 30-month sentence was necessary for CR to be placed in the BOP's only intensive residential treatment program was critical to Judge Weinstein's specific sentence. GA309-312. The court ordered that CR be treated in the Residential Sex Offender Treatment Program at Federal Medical Center Devens. GA 312.

32

**ARGUMENT**

**POINT I**

**THE DISTRICT COURT'S CALCULATION OF THE RECOMMENDED GUIDELINE RANGE WAS PROCEDURALLY REASONABLE AND NOT CLEARLY ERRONEOUS**

The government contends that the district court's sentence was procedurally unreasonable because it committed three errors in its calculation of the recommended guideline range.  G.Br. 55-61. Specifically, the government contends that the court erred in rejecting  the government's proposed offense level enhancements of 5 levels for a pattern of sexual abuse of a minor pursuant to § 2G2.2(b)(5), 2 levels for distribution pursuant to § 2G2.2(b)(3)(F), and 2 levels for use of a computer pursuant to § 2G2.2(b)(6).  G.Br. 56-61.  The government acknowledges that the standard of review is abuse of discretion for procedural reasonableness, and that the  district court's factual findings must be affirmed unless they are clearly erroneous.  G.Br. 55-56. United States v. Villafuerte, 502 F.3d 204, 206 (2d Cir. 2007). Two of the guideline enhancements sought by the government, for a pattern of sexual abuse and distribution, were rejected by the court on factual grounds and therefore the court's findings are reviewed only for clear error. The third alleged error, the district court's rejection of the 2-level enhancement for use of a computer, is reviewed for abuse of discretion.

33

A.   **The Court's Finding That CR Did Not Commit a Pattern of Abuse Is Not Clearly Erroneous**.

Judge Weinstein heard all of the facts surrounding CR's three episodes of incest with his sister, including the facts that two of the episodes took place when CR was 15 and 16, that the first episode occurred when the father placed the siblings in the same bed in a hotel, and that the episodes were widely separated in time despite frequent contact between the siblings during all of those years.   The court found that this conduct did not constitute a "pattern" of sexual abuse but was rather aberrant conduct caused by the failure of proper parental supervision. This factual finding is not clear error and should not be disturbed.

The government asserts that there is no "exception" under the guideline for prior acts that are "aberrant" or "due to the failure of proper parental supervision." G.Br. 57.  But the guideline does not recommend an enhancement for every prior act of sexual abuse, only where there is a pattern. Whether there is a "pattern" is a question of fact.   See, H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 238-39 (1989)(interpreting the "pattern" element in the RICO statutes, the ordinary meaning of "pattern" requires more than sporadic activity; it requires continuity and relationship between the acts); United States v. Eppolito, 543 F.3d 25, 57 (2d Cir. 2008)(whether a pattern is proven in a RICO case is a question fact for the jury).   Judge Weinstein found that the conduct was aberrant, which is isolated conduct, the opposite of a

34

pattern.  See Eppolito, supra, at 50 (pattern excludes "isolated" or "sporadic" activity).  These episodes were an unfortunate result of CR's dysfunctional household, in which a pathologically sexually charged atmosphere prevailed among the adults, pornography was easily available to CR, and there was virtually no supervision. They were also the result of CR's youth and extreme immaturity and the court found no likelihood that such conduct would be repeated.

The government cites two cases holding that prior sexual offenses that are remote in time may be considered a pattern of sexual abuse under the guideline.  G.Br. 56-57, United States v. Turner, 626 F.3d 566, 572 (11th Cir. 2010); United States v. Olfano, 503 F.3d 240, 243 (3d Cir. 2007).  These cases do not support the government's claim of error in this case, first, because Judge Weinstein did not exclude consideration of any episode because of remoteness in time.  Second, although the facts of one case, Olfano, involved the defendant's juvenile convictions for sexual abuse, the Third Circuit did not address the applicability of the enhancement to juvenile conduct; apparently this issue was not raised.  Therefore, Olfano does not hold that juvenile conduct may be considered.  Third, these cases only hold that a particular act may be considered, not that it must be considered part of a pattern.  Even if a juvenile act may be considered, it is up to the judge as fact-finder to determine whether it is part of a pattern.

In its efforts to portray CR, a neglected and confused

35

teenager, as a predator, the government claims on appeal as it did
below that CR "continued to send sexually suggestive images to his
half-sister even after his arrest, while his sister was undergoing
mental health treatment." G. Br. 57. The government repeats and
exaggerates this claim: "Taking his predatory actions a step
further, the defendant continued to harass and victimize his
juvenile half-sister even after his arrest in this case, by sending
her sexually suggestive images while she was receiving mental
health treatment following her sexual abuse at his hands." G.Br.
48, see also G.Br. 8-9.

    In fact, this claim was unsubstantiated by any competent
evidence at the hearing and Judge Weinstein correctly refused to
credit it. The government's claim rests entirely on the following
testimony of Agent Thompson, the case agent:

> Q: Have you spoken to the defendant's
> half sister's mother about the defendant's
> sexual abuse of his half sister?
>
> A: Yes.
>
> Q: Is the defendant's half sister
> currently undergoing mental treatment?
>
> A: Yes.
>
> Q: During this treatment was it
> discovered the defendant has kept sending
> sexually suggestive pictures to his half
> sister?
>
> A: Yes.

G.Br. 8-9, 48, 57; GA 25, SA 42, 44.

The government omits the cross-examination, which revealed that this entire claim rested on a progress note written by a medical student when the half-sister was hospitalized, that the note gave no indication of when the purported images were sent, nor any description of the images or what made them sexually suggestive. SA 45-47. Agent Thompson did not interview CR's half sister, never saw the purportedly suggestive picture, and conducted no investigation of this allegation. SA 45-47.

This claim was aggressively pressed by the government below and Judge Weinstein refused to credit it, no doubt because it was unsupported by any evidence. In fact, this claim was nothing more than a characterization by an uncalled medical student that some picture or other, seen or unseen by the student, was "sexually suggestive." Clearly, "suggestive" is in the eye of the beholder. Many widely disseminated, mainstream magazine advertisements, for products such as perfume and jeans, could be considered "sexually suggestive." The court's refusal to credit this vague and unsupported claim was correct and far from clearly erroneous.

Undercutting the claim that CR harmed his half sister was her express wish, against her mother's orders, to maintain a relationship with her brother. SA 49. In fact, she sneaked into the prison hospital in Massachusetts where CR was being evaluated to try to see him. SA 50. This whole sorry story is far less one of sexual predation by one sibling against another than of family

37

dysfunction of epic proportion, in which the children and their family relationships were destroyed by the sexual pathology and relentless combat of the adults. In seeking to learn all of the facts and circumstances and in making factual findings based on his understanding of the family and psychological dynamics, Judge Weinstein did just what a court is supposed when it finds the facts. The court's finding that the 5-level enhancement for a pattern of sexual abuse did not apply was not clearly erroneous.

**B.  The District Court's Finding That the Distribution Enhancement Did Not Apply is Not Clearly Erroneous.**

The district found that CR did not "distribute" pornography in his file-sharing programs because he did not actually transfer any files but only passively made them available to the few people on his invited buddy list. Appellee told the court that he did not intend for his files to be downloaded but only intended to receive material; the program required the shared file. Those on his buddy list who wished to download files did so on their own, while CR was not even online. Based on his own questioning of CR, Judge Weinstein found that he did not intend to distribute. GA 166. Therefore, Judge Weinstein did not apply the 2-level enhancement pursuant to § 2G2.2(b)(3)(F).

The government contends that this was error and quotes the definition in the Application Note 1, which defines distribution. G.Br. 59. This definition does not further the government's argument, however. It defines distribution as "any act, including

38

"possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer" of pornographic material. The inclusion of possession with intent to distribute must refer to the definition of "distribute", which includes only production, transmission, advertisement, and transportation. The plain language of this definition does not include making material available to buddies in a private file-sharing program. Nor does the example that follows, which is quoted by the government (G.Br. 59):

> Accordingly, distribution includes posting material involving the sexual exploitation of a minor *on a website for public viewing* but does not include the mere solicitation of such material by a defendant.

§ 2G2.2, Application Note 1 (emphasis added).

There is no evidence that CR posted any child pornography on a website or anywhere publicly. The evidence established only that he shared his material with a limited number of invited buddies on his private file-sharing program. The government cites two cases from the Eighth and Fourth Circuits that hold that using peer-to-peer file sharing programs can constitute "distribution." G.Br. 59-60. United States v. Dodd, 598 F.3d 449, 452-453 (8th Cir. 2010); United States v. Layton, 564 F.3d 335 (4th Cir. 2009). Those cases are not binding on this Court and this Circuit has not addressed this issue. Moreover, this Circuit construes the guideline strictly and if there is ambiguity, applies the rule of

39

lenity. See United States v. McGee, 553 F.3d 225, 229 (2d Cir. 2009); United States v. Pabon-Cruz, 391 F.3d 86, 102, n. 19 (2d Cir. 2004) (rule of lenity applies to ambiguous sentencing statutes). Because the plain language of the guideline definition of distribution does not include making material available to buddies in a private file-sharing program, the enhancement does not apply to that conduct. If this Court concludes that the definition is ambiguous, the rule of lenity requires that it be construed narrowly and in favor of the criminal defendant. Id.

In any event, the out of Circuit cases cited by the government make clear that the determination of whether participation in a file-sharing program constitutes distribution is a question of fact that turns on the particular facts of each case. In Dodd the Eighth Circuit did not hold that participation in a file-sharing program was necessarily distribution, but only that the court could find that it was distribution in that case, where the defendant intended to share his material with anyone else who used Limewire. 598 F.3d at 451. Dodd affirmed the district court's factual finding that the defendant intentionally distributed by setting up his files that way and the Eighth Circuit specifically explained that distribution was a "fact-intensive inquiry." Id. By contrast, in United States v. Durham, 618 F.3d 921 (8th Cir. 2010), as the government acknowledges, (G.Br.60), the Eighth Circuit reversed the court's application of this enhancement because the

40

evidence did not prove that the defendant intended to distribute by using the file-sharing program.

Judge Weinstein found in this case, based on his own questioning of appellee, that he did not intend to distribute child pornography but only intended to receive it. GA 166. The program he used required him to share his material with invited buddies, but downloading by others was done when he was not present. The district court found as fact that there was no intentional distribution. This finding is not clearly erroneous.

**C.** **The District Court's Decision Not to Apply the 2-level Enhancement For Use of a Computer Was Not an Abuse of Discretion.**

The district court refused to apply the 2-level enhancement of § 2G2.2(b)(6) for use of a computer to commit the offense on the ground that every child pornography case involved use of the computer and that this was part of the basic offense. The government contends that this was an abuse of discretion because United States v. Johnson, 221 F.3d 83, 99 (2d Cir. 2000) held that this enhancement does not constitute double-counting. G. Br. 58.

Since Johnson, however, this Circuit has twice made the same observation as Judge Weinstein, that computer use is involved in virtually every child pornography case, and has highlighted this as one of the flaws of the child pornography guidelines. United States v. Tutty, 612 F.3d 128, 132 (2d Cir. 2010); United States v. Dorvee, 616 F.3d 174, 186 (2d Cir. 2010). In both of these

41

decisions, this Court explained that the child pornography guidelines are particularly flawed because the number of enhancements that "apply in nearly all cases" results in "virtually no distinction between" the ordinary, run of the mill offender and "the most dangerous offenders who, for example, distribute child pornography for pecuniary gain." Dorvee, 616 F.3d at 186-87; accord, Tutty, 612 F.3d at 132-33. The enhancement for use of the computer, applied in 97.2% of all cases in 2009, was singled out for particular scorn. Dorvee at 186. Because of the large number of such enhancements, this Court held that the child pornography guidelines should not be accorded undue deference and that sentencing courts must take particular care to independently review the sentencing factors. Id. at 184-88.

The government acknowledges these recent cases but nonetheless contends that the district court is "bound" to apply the enhancement because of the Johnson holding that it is not double-counting. The government essentially argues that the guideline enhancement must be applied, just so the district court can offset it with a variance, a highly technical argument that would make no difference in the sentence. For if Judge Weinstein were to apply the enhancement, he would certainly vary from the resulting higher guideline range on the ground that it was one of those enhancements that applied in virtually every case. Thus, if any guideline application error occurred, it was the most harmless of errors.

42

See Subsection D, *post*.

**D.   If There Was Any Procedural Error in the Calculation of the Recommended Guideline Range, It Was Harmless.**

It is well-settled that procedural error in calculating the recommended sentencing guideline range is harmless if "the record indicates clearly that 'the district court would have imposed the same sentence' in any event." United States v. Jass, 569 F.3d 47, 68 (2d Cir. 2009), quoting United States v. Cavera, 550 F.3d 180, 197 (2d Cir. 2008); see United States v. Bermingham, 855 F.3d 925. 934 (2d Cir. 1988)(guideline application error harmless where sentencing record is clear that the judge would impose the same sentence absent the error).

In this case, the record is abundantly clear that Judge Weinstein would have imposed the same sentence regardless of the recommended guideline range. Given all of the circumstances in this case, Judge Weinstein's consideration of the sentencing factors 3553(a) led him to conclude that the lower recommended guideline range that he applied was excessive. GA 160, 306-312. Indeed, the court concluded that the 5 year statutory minimum sentence constituted cruel and unusual punishment as applied to this case. Thus, the record demonstrates with certainty that the district court would have imposed the same sentence even if he had accepted all of the government's proposed guideline enhancements. Therefore, any error in the guideline calculation is harmless. Id.

43

## POINT II

**THE DISTRICT COURT'S RULING THAT A MANDATORY FIVE-YEAR SENTENCE FOR A CHILD PORNOGRAPHY OFFENSE WOULD CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT SHOULD BE AFFIRMED IN THE UNIQUE CIRCUMSTANCES OF THIS CASE**

Judge Weinstein concluded that imposition of the 5-year mandatory punishment for distribution of child pornography would violate the Eighth Amendment as applied to this grossly immature, adolescent defendant, who was raised in a chaotic and sexually overcharged household with virtually no supervision, who began viewing such materials when he was only 15, and whose only "distribution" was sharing pornography with a small number of "buddies" on a peer-to-peer file-sharing program. After a lengthy hearing with numerous experts in forensic psychology, adolescent psychology and brain development, sex offender risk assessment and treatment, Judge Weinstein concluded that CR was functionally a juvenile when he committed the offense, that he was an extremely immature juvenile whose emotional development had been stunted by his turbulent childhood, and that these factors made him both less responsible for his actions and more likely to be completely rehabilitated with treatment and maturation. GA 292-305.

Judge Weinstein did not hold that the sentence was grossly disproportionate under <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1001 (1991), but rather applied the "categorical" Eighth Amendment analysis applicable to juveniles under <u>Graham v. Florida</u>, 130 S.Ct.

44

2011 (2010) and Roper v. Simmons, 543 U.S. 551 (2005). Although the government acknowledges that Judge Weinstein "explicitly eschewed reliance on the Harmelin analysis" and instead applied the categorical approach of Graham, G.Br. 43, the government inexplicably devotes the first half of its argument to refuting disproportionality under Harmelin. G.Br. 30-42. Since Judge Weinstein himself concluded that the sentence was not grossly disproportionate under Harmelin, the only issue is the correctness of the court's ruling that the sentence is unconstitutional under the Graham analysis applicable to juveniles.

**A.   The Categorical Approach of *Graham* and *Roper***

The Supreme Court has explained that to determine whether a punishment is cruel and unusual, "courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a mature society.'" Graham v. Florida, 130 S.Ct. at 2021, quoting Estelle v. Gamble, 429 U.S. 97, 102 (1976). In Graham and Roper v. Simmons, 543 U.S. 551, the Supreme Court recognized that evolving standards of decency require constitutional limitations on the punishment of juveniles. Thus, the Court held that certain punishments, specifically capital punishment and life without parole for non-homicide offenses, are too severe for juveniles and that their imposition violates the Eighth Amendment. Graham, 130 S.Ct. 2021; Roper, 543 U.S. 551.

The Supreme Court's distinction between adults and juveniles

45

is based on scientific and empirical evidence that juveniles have a "lack of maturity and judgment and an underdeveloped sense of responsibility," that they "are more vulnerable or susceptible to negative influences and outside pressures," and that their characters are "not well formed" and their personality traits are "more transitory, less fixed." Roper v. Simmons, 543 U.S. at 569-570, quoted in Graham at 130 S.Ct. at 2026. Graham also relied on experts in psychology and brain science, who explained that there are "fundamental differences between juvenile and adult minds" and that "parts of the brain involved in behavior control continue to mature through late adolescence." Graham 130 S.Ct. at 2026. These characteristics of juveniles mean that "their irresponsible behavior is not as morally reprehensible as that of an adult." Roper, 543 U.S. at 569; quoting Thompson v. Oklahoma, 487 U.S. 815, 835 (1988). These characteristics also mean that, because juveniles are "more capable of change than are adults," their actions are less likely to be evidence of "irretrievably depraved character." Graham, 130 S.Ct. at 2026, citing Roper, 543 U.S. at 570.

Judge Weinstein relied on scientific studies and expert opinion, including testimony from Dr. Laurence Steinberg, the lead scientist for the amici in Roper and Graham, for his finding that the adolescent brain is still developing at ages 18 and 19, that particularly those parts of the brain related to impulse control

46

and risk-taking behavior continue to develop in late adolescence, that maturation rates are uneven, and that there is no scientific basis to conclude that a given 19 year old would be more developed than a 17 year old. GA 293-96. Therefore, after hearing voluminous evidence that CR was a particularly immature adolescent, on the slow end of the spectrum for emotional development, Judge Weinstein determined that the categorical analysis for juveniles applied equally to this "grossly naive and immature" adolescent. GA 301-304.

The categorical approach requires the court to first determine whether there is a national consensus against the particular sentencing practice, here, the application of a five year mandatory minimum sentence on a juvenile for a child pornography offense. Graham, 130 S.Ct. at 2022, Moreover, the Supreme Court made clear that a consensus against a sentencing practice can be found despite the existence of statutes that permit the practice. Id. at 2023. "Actual sentencing practices" can reveal an emerging consensus against a practice that is permitted by statute. Id.

Judge Weinstein surveyed state sentences for child pornography and determined that they were on average far less severe than the federal sentencing guidelines and that four states had recently changed their mandatory minimum sentencing laws to account for developmental differences between youth and adults. GA 290. More than half of federal child pornography offenders who were not

47

producers received sentences below the guideline range, demonstrating widespread views among the federal judiciary that the sentences were too high. GA 291. Most telling, a survey of federal judges revealed that 71% thought the mandatory minimum sentences for receipt of child pornography (5 years) were too high, and 37% thought the mandatory minimum was too high for distribution, an offense that includes commercial distributors as well as those who only engage in peer-peer file-sharing, as CR did. GA 280. These factors, as well as numerous judicial opinions, see e.g., United States v. Dorvee, 616 F.3d 174 (2d Cir. 2010); United States v. Grober, 624 F.3d 592 (3d Cir. 2010), demonstrate an emerging consensus that the child pornography sentences are too high in general. GA 280-283. As applied to adolescents, stronger opposition to high sentences has been expressed by many judges. See United States v. Polito, 215 Fed.Appx. 354, 357 (5th Cir. 2007)(per curiam)(affirming sentence of probation for immature 18 year old); United States v. Stern, 590 F.Supp.2d 945, 953 (N.D. Ohio 2008)(substantial downward variance for college student who began viewing when 14 years old); United States v. Wachowiak, 412 F.Supp.2d 958 (E.D. Wis. 2006)(substantial variance for 24 year old student who began viewing his father's videos at a young age). Judge Weinstein also cited these cases.

Graham held that community consensus is "entitled to great weight," but is not the end of the inquiry. 130 S. Ct. at 2026.

Next, the court must exercise independent judgment and consider the culpability of the offender in light of his crimes and characteristics, and the severity of the punishment. The court must also determine whether the challenged sentencing practice serves legitimate penological goals. Id. Roper and Graham both recognized that the developmental differences between juveniles and adults made juveniles less culpable and therefore less deserving of the most severe punishments. Graham, 130 S.Ct. at 2026; Roper, 543 U.S. at 569.

Judge Weinstein relied on these cases, the scientific studies cited in them, and additional studies to come to the same conclusion. GA 295-297. Moreover, Judge Weinstein considered the fact that the particular crime involved, peer-to-peer file sharing by teenaged boys of easily available internet pornographic pictures of children only a few years younger "does not signify the sort of social deviance" that it might in an older person. Judge Weinstein considered it significant that CR, a teenager "confused about his developing sexuality in a splintered and dysfunctional family," began viewing such material when he was only 15 and still a child himself. GA 304. Judge Weinstein cited several other cases in which sentencing courts considered it highly mitigating that the defendant began viewing child pornography when very young himself. GA 304.

After applying the Graham analysis, and considering the

49

culpability of the offender in light of his crimes, and the severity of the punishment, Judge Weinstein concluded that imposition of a five-year minimum sentence "serves no legitimate penological goal." GA 305. The court therefore held that the mandatory minimum sentence violated the Eighth Amendment as applied to CR.

Although Judge Weinstein followed the reasoning of <u>Graham</u> and <u>Roper</u>, the government takes issue with his analysis. The government contends that there is no consensus against the application of mandatory minimums for child pornography and it points to the fact that only 37% of federal judges surveyed thought that the mandatory minimum for distribution was too stringent. G.Br. 46. However, "distribution" includes a wide range of conduct that is much more culpable than participating in a peer-to-peer file sharing program, such as commercial distribution. CR's conduct represents the most minimal form of distribution, essentially the same conduct as "receipt," which also carries a mandatory minimum of 5 years, which 71% of federal judges thought was too stringent.

Moreover, this survey only measures opposition to mandatory minimums for child pornography offenses in general, and does not specifically measure the consensus against application of those minimums to adolescents. For that, Judge Weinstein relied on the changes in state laws with respect to adolescents as well as judicial opinions from around the country, like <u>Polito</u>, <u>Stern</u>, and

50

<u>Wachowiak</u>, cited above, as well as <u>United States v. Strayer</u>, 2010 WL 2560466 (D. Neb. June 24, 2010) (substantial downward variance for 25 year old who was emotionally closer to an adolescent) and <u>United States v. Larson</u>, 558 F.Supp. 2d 1103 (D.Mon. June 5, 2008) (5-year mandatory minimum held unconstitutional as applied to mentally retarded 21 year old), opinion vacated after receipt count was dismissed on other grounds, <u>United States v. Larson</u>, 346 Fed. App'x. 166, 168 (9th Cir. 2009).

The government also contends that CR was not a juvenile, that the court erred in treating him as one, and that the court particularly erred in considering the fact that CR began viewing child pornography when he was 15. G.Br. 46-47. Judge Weinstein's factual findings and conclusions were grounded in the scientific evidence before him, as well as the opinions of the Supreme Court. The district court reviewed scientific literature and heard expert testimony establishing that the brain is still maturing during adolescence, that adolescence does not magically end at age 18, that emotional development is variable, and that the brain may not fully mature until the early to mid 20's. Further, the expert testimony established that CR was very immature and underdeveloped for his age and when he was arrested at age 19, he was an immature adolescent. Therefore, the evidence before Judge Weinstein established that in this case, CR was no different than a juvenile.

Judge Weinstein found support for this in the case law. GA

51

293.  In <u>Roper</u>, the Supreme Court explained that  "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." 543 U.S. at 574.  And the Court noted in <u>Graham</u> that "parts of the brain involved in behavior control continue to mature through late adolescence." 130 S. Ct. at 2026. The Supreme Court in these cases relied on the same scientific evidence that Judge Weinstein had before him.

Moreover, contrary to the government's claim, the fact that CR began viewing child pornography when he was just a child himself, as an immature 15 year old, was certainly relevant to Judge Weinstein's analysis.  Other courts have recognized that in addition to the immaturity, pure and simple, of teenagers, the development of interest in lewd pictures of minors by one who was a minor himself does not manifest the same kind of sexual perversion as would a 35 or 40-year-old person who was interested in the same pictures.  In <u>United States v. Stern</u>, 590 F.Supp.2d 945, 953 (N.D. Ohio 2008), for example, the district court emphasized the peer-level nature of the sexual interest in varying far below the guideline range for a college student who had begun viewing child pornography at age 14: "Stern was 14 years old when he began to view pornographic images, and at that time, he was looking at images of girls his own age."  The <u>Stern</u> court cited the scientific literature on "the unformed nature of the adolescent brain" and also the "fundament[al] differen[ce] in kind" between a

14-year old [sic] looking at pictures of other 14-year-olds and a 40-year-old who looks at pictures of 14-year-olds. Id. at 953 n.6. "The 14-year-old is acting on normal impulses in an unacceptable manner (and may well be unaware of the impact of his crime), whereas the 40-year old [sic] is acting on deviant impulses and is expected to understand the terror that this crime inflicts upon its victims." Id.; see also, United States v. Wachowiak, 412 F.Supp.2d 958 (E.D. Wis. 2006) (substantial downward variance for 24-year-old student whose obsession with pornography began at a young age, watching this father's videos). Thus, the age at which a defendant began viewing such pictures is an important factor in assessing his level of moral culpability, as Judge Weinstein concluded.

The government asserts that CR's moral culpability was "quite high" because he amassed a large quantity of material over a number of years, but during most of these years, CR was legally a juvenile, even under the government's definition. The government relies heavily on the episodes of incest with his half-sister, which again occurred mostly when he was well under 18, and which Judge Weinstein found to be isolated, aberrant conduct caused by his chaotic and sexually overcharged upbringing and lack of supervision. Finally, the government again asserts its claim that CR continued to "victimize" his half-sister by sending her sexually suggestive images after his arrest, a claim that was totally unsubstantiated and was not credited by the district court. See

53

pp. 35-37, *ante*.

The government points out that the five-year mandatory minimum sentence is a far cry from the life sentence at issue in Graham. G.Br. 48. It is true that the sentence is much shorter, but it would be imposed for a much less serious offense, peer-to-peer sharing of internet child pornography, not the armed burglary involved in Graham. And Graham teaches that the severity of the sentence must be considered "along with the culpability of the offenders at issue in light of their crimes and characteristics," to determine whether the sentence "serves legitimate penological goals." Judge Weinstein determined that for this crime, committed at this age and level of immaturity, the mandatory five year sentence serves no legitimate penological goal.

The government reverts to the Harmelin analysis and argues that the sentence is not "grossly disproportionate," G.Br. 50, an argument that is not relevant to Judge Weinstein's ruling. In fact, Judge Weinstein recognized that this was not a Harmelin disproportionality case but a categorical case under Graham.

Finally, the government contends that Graham precludes a focus on the maturity of the particular defendant in favor of a categorical approach that applies to juveniles as a class. G.Br. 51. It is true that the Supreme Court in Graham chose to categorically prohibit juveniles as a class from receiving sentences of life without parole for non-homicide offenses. But

54

this was not because the Court considered a case-by-case approach to be inconsistent with the constitutional analysis. On the contrary, the Court pointed out that a case-by-case inquiry that takes the offender's age into consideration would be "[a]nother possible approach" and explained the benefits of that approach. 130 S.Ct. at 2031. The court decided, however, that life without parole was such an extreme punishment and juveniles presented such special difficulties in representation, that a case-by-case approach would run the risk that such sentences would be imposed in error. Id. at 2032. The Court reasoned that a "categorical rule avoids the risk that . . . a court or jury will erroneously conclude that a particular juvenile is sufficiently culpable to deserve life without parole for a non-homicide." Id.

Thus the Supreme Court did not preclude an as applied analysis, as the government contends. It simply chose a categorical ban for the extreme penalty of life without parole, to ensure that  no mistake could be made.

## POINT III

**THE GOVERNMENT'S CONTENTION THAT THE DISTRICT COURT ERRED IN ALLOWING VOLUNTARY SURRENDER FOR SENTENCE IS BOTH ERRONEOUS AND MOOT.**

In Point III, the government raises a frivolous issue, which it acknowledges is moot. G.Br. 62-63. It claims that Judge Weinstein's routine order allowing CR to voluntarily surrender to his designated prison, rather than be transported by the Marshals, was somehow rendered illegal simply because the government filed an appeal of sentence. Essentially, the government is suggesting that the government appeal transformed ordinary self-surrender into his release pending appeal, and it points to the bail statute precluding the defendant's release pending a government appeal, 18 U.S.C. § 3742. G.Br. 62. The bail statute is the government's sole support for its argument that Judge Weinstein was wrong to allow self-surrender.

The government's argument makes no sense. Judge Weinstein did not grant CR release pending the government appeal. The court simply allowed him to surrender for his sentence directly to his designated facility, a routine occurrence. Moreover, the government acknowledges that this issue is moot because CR has long since surrendered and is serving his sentence.

## CONCLUSION

For the foregoing reasons, the judgment should be affirmed.

Respectfully submitted,

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU

By: _____

**COLLEEN P. CASSIDY**
Attorney for Appellee
**C.R.**
52 Duane Street, 10th Floor
New York, New York 10007
Tel.: (212) 417-8742

---

## CERTIFICATE OF SERVICE

I certify that a copy of this Brief has been served by first-class mail on the United States Attorney/E.D.N.Y.; Attention: **ALI KAZEMI and AMY BUSA, ESQ.,** Assistant United States Attorneys, **c/o PATRICE M. JOHNSON**, Paralegal Specialist, 271 Cadman Plaza East, Brooklyn, New York 11201.

Dated: New York, New York
January 23, 2012

_____

**COLLEEN P. CASSIDY**

57

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 12,846 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a monospaced typeface using **Corel WordPerfect X5** with **10 characters per inch in courier new** type style.

Dated:  New York, New York
        January 23, 2012

COLLEEN P. CASSIDY